

U.S. Department of Justice

Antitrust Division

---

*Steven Tugander*
*Trial Attorney*

*Direct Dial: 212-335-8032*
*E-mail:steven.tugander@usdoj.gov*

*New York Field Office*

26 Federal Plaza
Room 3630
New York, New York 10278-0140

212/335-8000

FAX 212/335-8043

April 18, 2014

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street,
New York, New York 10007

    Re: *United States v. Daniel Naeh, 10-CR-139 (HB)*

Dear Judge Baer:

    The Government respectfully submits this letter pursuant to § 5K1.1 of the United States Sentencing Guidelines (hereinafter "§ 5K1.1") to provide the Court with the details surrounding the substantial assistance that Defendant Dani Naeh has provided to the Government in its investigation and prosecution of bid rigging and fraud in the municipal bonds industry. Because Defendant Naeh has substantially assisted the Government's investigation for almost seven years, the Government will request at the time of sentencing that the Court sentence the Defendant in light of the factors set forth in § 5K1.1(a)(1)-(5) and thereby depart from the Guidelines. Defendant Naeh is scheduled to be sentenced on May 8, 2014.

    I.  <u>Background</u>

    The Information in this case was filed on February 23, 2010. It charges one count of violating 15 U.S.C. § 1, one count of violating 18 U.S.C. § 371 (with the objects of violating 18 U.S.C. § 1343 and to defraud the IRS) and one count of violating 18 U.S.C. § 1343. On February 23, 2010 Defendant Naeh pleaded guilty to each of the three above-referenced charges pursuant to a plea and cooperation agreement filed the same day.

    II.  <u>Defendant Naeh's Conduct</u>

    CDR was one of the oldest and largest brokers of municipal investment agreements in the United States. David Rubin was the company's founder, chief executive officer, managing director and sole owner. As sole owner, Rubin received the vast majority of the firm's profits. Zevi Wolmark was employed by CDR as its chief financial officer and managing director. Lower level employees including Defendant Naeh, Douglas Goldberg, Matthew Rothman and Evan Zarefsky, conducted bidding on behalf of CDR and reported to Rubin and Wolmark.

*Letter to Judge Baer - United States v. Daniel Naeh: Request for 5K Departure*

Defendant Naeh's employment with CDR began in approximately 1991. From approximately 1991 to 1995, Defendant Naeh's work related to CDR's pension business and did not involve competitive bidding. Starting in 1995, Naeh was a marketer in CDR's municipal reinvestment business with responsibility for conducting bids. In late 2002, Defendant Naeh moved to Israel, but continued working in the same capacity at CDR. Defendant Naeh was fired in May 2004.

In addition to conducting bidding, Defendant Naeh was also responsible for getting CDR hired to act as bidding agent for municipalities. On those occasions when Defendant Naeh was successful in getting CDR hired to broker particular transactions, he received commissions on those transactions in addition to his salary. These included transactions referred by, among others, Bank of America and Bear Stearns. Defendant Naeh successfully developed relationships with senior executives at these two banks.

Count One charged Defendant Naeh with participating in a conspiracy to rig bids. Specifically, Defendant Naeh, CDR and various co-conspirator providers entered into an agreement whereby the co-conspirators arranged which providers would win contracts in advance of the bidding. More specifically, Defendant Naeh and CDR often arranged for the provider that was serving as the underwriter on the underlying bond issue to be the winner.[1] As part of the agreement, the designated winning bidder often provided Defendant Naeh and others at CDR with the bid rate at which it desired to win, and Defendant Naeh and CDR would then provide the rate to other conspirators, with the understanding that they would bid less competitively than the winning bidder's desired rate. Accordingly, providers that were designated to lose particular contracts submitted intentionally non-competitive bids to CDR. Moreover, on many occasions CDR took steps to further reduce competition by limiting bid lists to conspiring providers and other bidders that could not reasonably compete. The conspiracy was designed to and did allow conspiring providers to win bids at artificially increased profit levels. Following the award of bids, CDR and various co-conspirator providers submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the Treasury regulations.[2]

In exchange for CDR's manipulating the bidding process to favor particular providers, Defendant Naeh and other CDR employees arranged for CDR to be paid kickbacks that were sometimes disguised as legitimate broker fees on other, seemingly unrelated transactions. Defendant Naeh received commissions on kickbacks that were paid by certain providers, including Bank of America and others. Because he received a commission of approximately thirty percent of all revenue generated by such providers, Defendant Naeh had a financial incentive to rig bids in favor of these providers at artificially increased profit levels and to seek kickbacks.

---

[1] The underwriter was often the financial institution that had recommended to the municipality that it hire CDR to act as broker.
[2] In almost all cases, the false certifications that were submitted by CDR were not signed by Defendant Naeh, but rather, by other CDR employees.

There were at least ten providers that participated in the charged bid–rigging conspiracy with CDR, including Bank of America ("BOA"), JP Morgan (later JPMorgan Chase), UBS, First Union (later Wachovia), Bear Stearns, Lehman, Société Générale, SunAmerica, GE and FSA. During the course of its investigation, the Government has identified that between 1998 and 2006, approximately 210 separate investment agreements for approximately 103 issuers were subject to the bid-rigging conduct.

Count Two charged Defendant Naeh with conduct that he engaged in with employees of FSA, a provider of investment agreements. Specifically, Defendant Naeh and other CDR employees steered investment agreements to FSA by disclosing improper, confidential information that allowed FSA to win bids for investment agreements at artificially determined and suppressed interest rates. In addition, Defendant Naeh and other CDR employees frequently requested and received intentionally losing "courtesy" bids from FSA. These intentionally losing bids made it appear to municipalities and the IRS that FSA had competed for particular investment contracts, when in fact it had not. Following the award of bids, Defendant Naeh, CDR and FSA submitted numerous written misrepresentations, falsely certifying that the bidding had been conducted in a *bona fide* manner, and in accordance with procedures outlined by the Treasury Regulations.

In exchange for CDR's manipulating the bidding process to favor FSA, Defendant Naeh and CDR arranged for CDR to be paid kickbacks that were disguised as legitimate "hedging" or "swap brokerage" fees.[3]  FSA paid approximately nine such kickbacks totaling $707,600[4] to CDR, although the actual physical payments to CDR were made by co-conspirators UBS and Royal Bank of Canada ("RBC"). The nine or so kickback payments were associated with investment agreements for approximately seven bond issues that CDR steered to FSA by manipulating the selection of providers asked to bid and, in many instances, allowing FSA to lower its initial bid.

During the course of its investigation, the Government has identified that between 2001 and 2006, investment agreements associated with approximately 62 separate bond issues were subject to the conspiracy charged in Count Two. Of these, approximately fourteen were bond issues that were also subject to the bid-rigging conspiracy charged in Count One. FSA won approximately 33 of the subject investment agreements and submitted intentionally losing bids for approximately 29 of them.

---

[3] In conjunction with winning investment agreements, FSA routinely entered into hedging transactions with third party financial institutions in order minimize its interest rate risk. On a number of fraudulent transactions, FSA paid kickbacks to CDR that were disguised as fees paid for brokering these secondary hedging transactions, when in fact the payments were made in exchange for CDR's assistance in manipulating the bidding process. The conspirators took steps to further conceal these payments from detection by arranging for third parties, rather than FSA, to make the "brokerage" payments directly to CDR. FSA would in turn reimburse these third parties for the full amount of the kickbacks.

[4]  Of this total, $65,600 in kickbacks was associated with approximately two investment agreements where the bids were rigged as part of the conspiracy charged in Count One.

The conduct charged in Count Three, a substantive wire fraud charge, encompasses the same conduct that is charged in Counts One and Two as well as additional conduct involving additional providers, including GE and its employees Dominick Carollo, Steven Goldberg and Peter Grimm, and some of the same providers involved in the bid-rigging conspiracy. Count Three alleges that as part of the scheme, Defendant Naeh's co-schemer, FSA, wired an interest payment to one of the numerous municipalities that was victimized by the scheme. During the course of its investigation, the Government has identified that between 1999 and 2006, the scheme charged in Count Three affected approximately 210 separate bond issues.

### III. The Government's Investigation and Prosecutions of the Municipal Bonds Industry

The Information and plea agreement filed in this case resulted from a wide-ranging investigation of bid rigging and fraud related to the municipal bonds industry that began in late 2004. The investigation uncovered fraudulent, anti-competitive behavior by numerous individuals that were employed by bidding agents and major financial institutions. These collusive and fraudulent practices, involving complex financial instruments, affected the bidding for contracts for the investment of billions of dollars of public funds and consequently victimized the United States Treasury as well as countless municipalities located throughout the United States.

To date, fourteen individuals and one corporation have pleaded guilty to antitrust, fraud, and other charges. In addition, five large financial institutions have entered into settlement agreements requiring them to pay approximately $743 million in restitution, disgorgement and penalties. Moreover, six former employees of financial institutions were tried and convicted of multiple counts in the SDNY before Your Honor and Judge Wood.[5] Sixteen defendants have been sentenced to date. As detailed below, Defendant Naeh's nearly seven years of cooperation has substantially assisted the Government in achieving these results.

### IV. Defendant Naeh's Cooperation

#### A. Background

Defendant Naeh's counsel approached the Government regarding potential cooperation in approximately mid-2007. At the time of counsel's approach, the Government had been in the process of reviewing a large volume of audio recordings and documents that had been obtained in the investigation. The recordings and documents implicated CDR and several employees, including Defendant Naeh, in multiple wire fraud and bid rigging conspiracies with numerous individuals and financial institutions. At the time of counsel's approach, other witnesses had

---

[5] In November 2013, the Second Circuit Court of Appeals reversed the convictions of three defendants (Dominick Carollo, Steven Goldberg and Peter Grimm) on statute of limitations grounds. Each of these three defendants had been found guilty in May 2012 following a jury trial before Your Honor. In January 2014, the Government filed a motion requesting *en banc* review of the Second Circuit's reversal of the three convictions. The motion is currently pending.

4

been cooperating, including three former CDR employees (Mark Zaino, Douglas Goldberg and Matthew Rothman), but none had been employed by CDR as long as Defendant Naeh, nor had any of the former employees been responsible for maintaining their own clients or getting CDR hired to conduct bids. As a result, at the time of Defendant Naeh's approach, the Government still had a need for additional CDR witnesses to advance its investigation and was particularly interested in Defendant Naeh's ability to cooperate and provide additional evidence against CDR's owner David Rubin and a senior executive of Bear Stearns. In addition, the Government wanted additional witnesses to corroborate other cooperating witnesses as well as to help analyze and review the voluminous incriminating recordings and documents it had obtained and anticipated obtaining.

In approximately July 2007, Defendant Naeh agreed to, and began cooperating in the Government's wide-ranging investigation. Defendant Naeh's agreement to cooperate included: meeting with the Government whenever it requested, making approximately sixteen trips from Israel to New York, mostly at his own expense; making covert consensual audio recordings of industry participants; providing, reviewing and analyzing industry audio recordings and documents; and testifying at grand jury sessions and trials if necessary. From the Government's perspective, there is no question that Defendant Naeh has done all that was requested of him and has fulfilled the terms of his cooperation agreement in all respects.

### B. 5K1.1 Factors

Section 5K1.1 sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has provided substantial assistance. The application of each of those factors to Defendant Naeh's cooperation is set forth below.

#### 1. The Significance and Usefulness of Defendant's Cooperation

At the time he began cooperating, the Government wanted assistance from additional inside witnesses such as Defendant Naeh to provide specific evidence of the origins and implementation of the crimes under investigation. Defendant Naeh's cooperation also required him to explain the incriminating recordings and documents the Government had obtained to help put them in context. As noted above, Defendant Naeh's employment with CDR began in approximately 1991, and from 1995 to 2004 he was employed as a marketer in CDR's municipal reinvestment business with responsibility not only for conducting competitive bidding, but also for getting CDR hired to conduct such bidding. Moreover, because he had been employed by CDR for a lengthy period and maintained his own clients, Defendant Naeh was in a unique position to provide incriminating, direct evidence against numerous industry participants in connection with conduct that occurred during the 1998-2004 conspiratorial period. These participants included CDR's owner, David Rubin, its chief financial officer, Zevi Wolmark, and a number of senior executives who were employed by various financial institutions including Bank of America and Bear Stearns.

Defendant Naeh is a citizen of both the United States and Israel. Defendant Naeh has resided in Israel with his family since 2002 and thus, has resided in Israel throughout the entirety of the Government's investigation.[6] As part of his plea agreement, Defendant Naeh signed a factual statement that provides the Government with a sufficient basis for extradition should Defendant Naeh breach the agreement. In addition, as part of his plea agreement, Defendant Naeh explicitly agreed to waive his right to oppose or contest any future Government request for extradition. Defendant Naeh's agreement to cooperate and waive extradition provided two significant benefits to the Government. First, as detailed below, Defendant Naeh's cooperation greatly assisted the Government in obtaining crucial incriminating evidence against numerous culpable individuals and corporations. Second, it allowed the Government to file charges against Defendant Naeh without having to work through an extradition process, saving the Government substantial time and resources.

Defendant Naeh met with the Government on approximately sixteen occasions, travelling from Israel to New York, mostly at his own expense. In addition, on several occasions, Defendant Naeh made himself available to the Government via teleconference. During his interview sessions, Defendant Naeh reviewed voluminous recordings and documents, and as a result the Government identified a large number of specific fraudulent transactions that formed the basis of substantial parts of four indictments that were returned during the course of the Government's investigation: *United States v. Rubin/Chambers, Dunhill, Insurance Services, Inc.*, No. 09 Cr. 1058 (S.D.N.Y.) (Marrero, J.); *United States v. Carollo*, No. 10 Cr. 654 (S.D.N.Y.) (Baer, J.); *United States v. Ghavami*, No. 10 Cr. 1217 (Wood, J.) and *United States v. Murphy* No. 3:12-CR-235 (Cogburn, J.). In addition, the Government's investigation was advanced by Defendant Naeh's unique production of a substantial number of bid documents and e-mails that related to the conspiratorial conduct. Moreover, to the extent that the Government had questions about particular pieces of evidence that it was in the process of analyzing, Defendant Naeh provided assistance in helping to answer these questions. In addition, Defendant Naeh provided the Government with substantial background information regarding the inner workings of CDR and other financial institutions, and was particularly helpful in fleshing out the nature of relationships that CDR employees had with the various companies and individuals with whom they conspired, including his own clients. Likewise, covert audio recordings that were made by Defendant Naeh provided additional information that the Government had not otherwise obtained. In this regard it is important to note that Defendant Naeh consensually recorded an industry participant with whom Defendant Naeh had a close, personal relationship. Furthermore, Defendant Naeh spent a substantial amount of time assisting the Government in revising transcripts of audio recordings that were used at trial.

As noted above, partially as a result of Defendant Naeh's cooperation, four indictments were returned against ten individuals and one corporation. The first, *United States v. Rubin/Chambers, Dunhill, Insurance Services, Inc.*, charged the corporate entity CDR, and three

---

[6] Evidence obtained by the Government during its investigation suggests that Defendant Naeh's decision to move to Israel in 2002 had been in the planning stages for several years prior to 2002. Moreover, the evidence suggests that his decision to move to Israel was a family decision and was in no way motivated by a desire to escape the jurisdiction of the United States in connection with his criminal conduct.

of its employees Rubin, Wolmark and Zarefsky. This indictment resulted in guilty pleas by each of the four defendants shortly before trial was scheduled to commence in January 2012. Defendant Naeh spent substantial time meeting with the Government preparing for the *Rubin* trial, and would have testified as a key inside CDR cooperating witnesses against each of the four defendants had the case proceeded to trial. It is the Government's belief that each of the four defendants' decision to plead guilty was motivated at least in part, by Defendant Naeh's decision to testify on behalf of the Government.

Shortly after all four *Rubin* defendants pleaded guilty, Defendant Naeh began meeting with the Government in preparation for the trial of the second indicted case, *U.S. v. Carollo*, which commenced in April 2012. Defendant Naeh eventually testified in the *Carollo* trial over the course of two days. During the course of his testimony, Defendant Naeh first provided overview evidence regarding the origins and general workings of the charged conduct, and second provided specific evidence related to eight transactions. His testimony regarding the eight specific transactions required him to explain and describe a variety of particular audio recordings and documents. Defendant Naeh's testimony was also particularly effective in explaining the inner workings of CDR's kickback schemes with providers and the specific harm that resulted from CDR's kickback conduct.

The trial resulted in the conviction of all three defendants on multiple counts. In the Government's view, Defendant Naeh was a valuable witness, who testified effectively and substantially assisted the Government's ability to present incriminating evidence to the jury. His testimony was especially valuable with respect to the convictions of Defendants Goldberg and Grimm because he provided general and specific testimony regarding his numerous interactions with these two defendants.

Beginning in approximately mid-2013 and continuing until January 2014, Defendant Naeh met with the Government on approximately five occasions in preparation for his trial testimony in *United States v. Murphy*. Defendant Naeh's testimony became unnecessary however, when the defendant, Phillip Murphy, a former senior executive at Bank of America, pleaded guilty on the eve of trial. Had the case proceeded to trial, Defendant Naeh would have testified as a key witness. As noted above, Defendant Naeh successfully developed relationships with senior executives at Bank of America, including the defendant Phillip Murphy. For this reason, it is the Government's belief that Murphy's decision to plead guilty was motivated at least in part, by Defendant Naeh's decision to cooperate and testify on behalf of the Government.

In January 2011, the Government conducted interviews of Defendant Naeh on two consecutive days. During portions of these interviews, Defendant Naeh answered questions regarding conduct that was charged in *United States v. Ghavami*, a case that was tried in July and August of 2012. Although he was placed on the Government's witness list, the Government determined prior to trial that Defendant Naeh's testimony was not necessary. Nonetheless, Defendant Naeh stood ready to testify in the *Ghavami* trial if the Government had so requested.

Moreover, during the course of his nearly seven years of cooperation, Defendant Naeh provided incriminating information against additional uncharged industry participants including numerous individuals and corporations. For a variety of reasons, the Government did not file charges against these additional potential defendants. Nonetheless, Defendant Naeh spent many hours discussing the conduct of these uncharged subjects, and stood willing to testify at trial if needed.

### 2. The Defendant's Truthfulness, Completeness and Reliability

During the time period that he has cooperated, Defendant Naeh has been truthful, complete and reliable. In the Government's view, Defendant Naeh has strived to be as helpful and cooperative as possible. Defendant Naeh did not attempt to shade the truth or provide information beyond his knowledge. Nor did it appear to the Government that Defendant Naeh ever attempted to withhold information, or protect particular individuals or corporations. Moreover, Defendant Naeh was reliable not only in his efforts to provide truthful information, but also by making himself available to the Government whenever he was needed. Furthermore, Defendant Naeh cooperated for more than three years without a written plea and cooperation agreement with the Government.

### 3. The Nature and Extent of the Defendant's Assistance

As noted above, Defendant Naeh has been cooperating with the Government's investigation since approximately July 2007. During this time, he has met with the Government more than sixteen times, including meetings with DOJ and SEC attorneys, FBI and IRS agents, and paralegals. Most of these meetings required Defendant Naeh to travel from Israel to New York for several days at his own expense. As part of his cooperation efforts, Defendant Naeh reviewed large volumes of audio recordings and documents, made consensual covert recordings and helped the Government draft transcripts. Defendant Naeh also performed a substantial amount of work for the Government outside of its presence and provided the Government with critical documents to which it otherwise lacked access. In short, Defendant Naeh has done everything that has been asked of him by the Government.

### 4. The Timeliness of the Defendant's Assistance

Defendant Naeh provided timely assistance that allowed the Government to quickly advance its investigation. As described above, his first meeting with the Government occurred in approximately July 2007, about eight months after the Government's investigation became overt. When Defendant Naeh began cooperating, the Government's investigation was at a relatively early stage and additional witnesses were needed, especially with respect to conduct of which Defendant Naeh had first-hand knowledge. Defendant Naeh was the first defendant to plead guilty in the municipal bonds investigation and his cooperation allowed the Government more than ample time to prepare the four above-referenced indictments that were returned in 2009, 2010 and 2012, and to prepare for four trials.

*Letter to Judge Baer - United States v. Daniel Naeh: Request for 5K Departure*

     5. <u>Risk of Injury</u>

Although the Government has no reason to believe that Defendant Naeh was ever in physical danger as a result of his cooperation, the covert recordings that he made subjected him to potential scorn from colleagues, friends and business associates. Moreover, because he was the first defendant to plead guilty in the municipal bonds investigation, Defendant Naeh was the subject of negative publicity earlier than any other subsequent defendant.

    V. <u>Conclusion</u>

Because as described above, Defendant Naeh has now cooperated in the Government's investigation and prosecutions for close to seven years, the Government respectfully submits that he has provided "substantial assistance" as that term is defined by the Sentencing Guidelines. Therefore, assuming that Defendant Naeh continues to comply with the terms of his plea and cooperation agreement, the Government will request on May 8, 2014, that the Court impose a sentence on Defendant Naeh that departs from the Guidelines, pursuant to § 5K1.1.

Respectfully submitted,

*/s/ Steven Tugander*
STEVEN TUGANDER
Trial Attorney
Antitrust Division


cc: Susan Hoffinger, Esq. (By E-Mail)
    Christopher Ferrall, U.S. Probation Officer (By E-Mail)